The next case this morning is 5-220-365 Furlong v. Boxx. Arguing for the appellant is Ryan Rich. Arguing for the appellee is John Huntley. Each side will have 15 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, gentlemen. Mr. Rich, are you ready on behalf of the appellant? Absolutely, Justice. Okay, you may proceed. May it please the court, Mr. Huntley. One of the beauties of having such a detailed, lengthy order in a case is that it allows us to kind of get into the mind of the trial court and see the actual reasoning behind the decision that was made. In this case, I believe we'll be able to point out that there are a number of findings that the trial court respectively just got wrong. At the heart of this case is the Illinois Drainage Code. In particular, the provision that states that a landowner shall not willfully or intentionally interfere with ditches or natural drains in such a manner the ditch shall become shall fill or become obstructed with any matter which interferes or impedes the flow of water. At trial, the defendant, Floyd Vox, admitted to the violation and the elements that we must prove to prove a violation of the Illinois Drainage Code. He admitted that he constructed the 200-foot-long concrete test cylinder wall that spanned the He admitted that he threw cylinders seven feet from the outlet of the culvert. He admitted that these cylinders and the test cylinder wall slowed down the water. Floyd Vox admitted that his wall backed up water and caused water to pool behind it. Attached to our appendix at page 23 is a photograph from February 17th of last year which shows the water backed up two thirds of the way into the culvert. And you can see the pooling behind the wall in that photo as well. Floyd Vox admitted that the water would not be backed up into that culvert and it would flow right on through there had his wall not been built. And then finally, Floyd Vox told the jury on July 1st, 2020 storm where water was backed up to such an extent that the area that he had walled off was filled with water. Water was coming over the wall. It filled up the culvert and it was so full that water was coming from the furlong property over the road rather than through the culvert because it was backed up to such an extent. It's our position that these admissions of Floyd Vox establish a violation under the Illinois Drainage Code. You know, the photographs that we've provided as part of this case or that were entered into exhibits into evidence in this case also establish this. Like I said, we have the February 17th photograph. We also have photographs earlier than that that can show where this dirt debris, this sediment has been caused to accumulate because of Vox's wall. The initial photographs show that you could see six test cylinders high on that wall. By at least January of 22, only the top three were visible. And that is because that wall is causing an obstruction. That wall is causing matter that flows through that culvert to accumulate at the base of that wall and block the flow of water. And with that alone, we believe we've established the violation of the drainage code that would entitle the furlongs to injunctive relief. However, the trial court disregarded the admissions of Floyd Vox and in fact made a specific finding that Vox's wall did not slow down or back up the water. That finding is against the manifest weight of the evidence in this case. I believe the case of... Mr. Rich, let me ask you. You asked for injunctive relief in this case. Injunctive relief would not be available if monetary damages would satisfy the issue at hand. Do you think monetary damages in this case is sufficient? No. No, and I do not. And that's because if the wall is not removed, Mr. Furlong is going to continue to experience these drainage issues and continue to have to fight these problems. Money will solve the problem of the cost to repair the culvert, and I'll get to that momentarily. But when looking at the facts of this case, I do believe the Illinois Supreme Court's decision in Go v. Goble is about as close to a factual similarity as you will find under Illinois law. In that case, the dominant estate, there is a culvert connecting the dominant estate to a Servian estate. That culvert went under, was embedded deep into the roadway, and discharged onto the Servian estate. The Servian estate decided to construct an earthen dam that was above the height of the culvert, blocking the water. Initially, the trial court in that case did not require the removal of the earthen dam, except for to the extent it matched the natural surroundings around it. In that case, there had been a culvert under the roadway for 40 years. If you look at this case, here we have a culvert embedded in a roadway, deep in the roadway, draining the Furlong property to the Box property. And then there's a dam on the other side, just 23 feet outside of the culvert that is as high as the culvert that's carrying the water from the Furlong property. If we're going to follow the case law in Illinois, we believe that Go v. Goble must be followed. The trial court did not consider that case in its decision. Mr. Rich, didn't Mr. Furlong construct his own ditches on his side of the road to direct water to the culvert and increase the flow of water through the culvert? Absolutely, he did. He had some ditching done in the field that he'd been doing for a number of years, and he also installed a new ditch along Stuber Road and recontoured the slope of a hill. And that's important, Justice Vaughn, for this reason is because I believe the when that was done. If the trial court was apparently under the understanding that Box had constructed his wall in response to Furlong doing that ditching work, but that was not the case. And the trial court in its order said that Box had constructed his wall in April of 2020. Box said he built it in 2019, starting in June and finishing in November. And it was not in response to Furlong doing the ditching and putting in the new culvert that Box built the wall. It was the other way around. Furlong was required to put in the new culvert in 2020 because Box had built the wall. And all years prior to that, I think the record reflects and the court found that in 2006, I believe, a culvert was installed or replaced. And then again in 2017. So we have this history that every 10 years that the culvert was needing to be replaced. However, just three years later in 2020, Brad Furlong goes out to inspect his field to do a spring maintenance and he can't even find the culvert. At that point in time, he had to get an excavator just to find it. And it was completely clogged, completely covered up. And the reason for that was Box had built that wall in that prior year. Box had scraped the north, the high area to the south and into the area where that culvert was. And we don't believe that the trial court could appropriately give weight to the facts of this case and the positions of the party because it got the date wrong when that wall was installed. Of course, if Box built that wall in response to this increased water coming in or this increased found in April of 20 couldn't have been related to the wall because it wouldn't have been built yet. But that's not the case. And we believe that taints the entire analysis that the trial court has here. It weighs on the credibility. It weighs on how the court views the facts. And we believe it's absolutely an error of the trial court based on the admissions of Floyd Box. It was built in 2019, not 2020. And it also weighs on the court's finding that somehow there was no evidence that Box's wall caused a drainage issue on the Furlong property. As we started out with today, Box admitted it backed up water, admitted it pooled water. We have a photograph that Box supplied from that July 1st, 2020 storm. You can see the water in the ditches and you can see the stunted corn. And frankly, I think the trial court got hung up on the fact that there had been drainage issues in this area previously, which is true. But Brad Furlong was trying to remedy these drainage issues, but was never allowed to because there was a 200 foot long wall, 23 feet outside of the culvert. And so whether or not we were able to show any additional damages than what was before is not relevant to the inquiry here. And we believe under the statute, we've proven everything that's required to prove. We don't believe we need to prove damages. We think it's implied in the statute that if there is an obstruction, it's going to lead to drainage issues. And the legislature requires when viewing this statute, that it be liberally construed for agricultural purposes. We don't believe that the trial court had done that. And we believe that because they had this misunderstanding or the apprehension of when the wall was built in relation to these problems, that it couldn't properly give weight to the facts of this case and the plaintiff's side of events. Mr. Rich, if your relief is granted and an injunction is granted and the wall has to come down, does that mean your client has to go back and refill in the ditches that he built to return the water to its original flow? Or what happens next? No, I believe under the statute and under the cases that Mr. Furlong has a right to increase the flow of water under the good husbandry rule. And that's part of this liberal construction that the statute is to be afforded for agricultural purposes. You can increase the flow of the water. So with respect to him recontouring the ditches, I don't believe that that's an element of the statute. I don't think that's required of the statute. And I think Mr. Furlong is completely within his rights to ditch his field. You know, it kind of goes to the point, too, of I want to address the trial court's finding that there wasn't any evidence that anything defendant did cause the problems, but it would have been something that Morton or Furlong did. Morton was a road commissioner. He had bladed the road. There was a dispute as to when the last time he bladed that road. Assuming it's true that Box's version is true that it was done in 2017, that does not explain the problems that Furlong was experiencing in 2020. The record reflects that Furlong was able to maintain that culvert. That culvert was functional. If it needed to be, he could clean it out until 2020 after Box had built his road from the south to the north. By all accounts, Morton wasn't on there since 2017, and the court is just speculating that something that Morton would have done when there wasn't problems before caused a problem in 2020. The same holds true for Brad Furlong. There is no evidence presented in this case that Brad Furlong did anything to negatively affect the drainage on his property. In fact, it was the entire position of the defendant in this case that he had increased the flow so well and did such a good job improving the drainage that it was causing too much water to flow onto their property. The trial court somehow speculated, and I think they took a line out of the Bowdoin shots case, that possibly it was something Brad Furlong did on his property to cause his own drainage issues. Well, that's not the case here because the defense didn't put on any evidence that something that Brad Furlong did negatively affected the drainage from his property. In Bowdoin shots, that was a case, and I think it's important to distinguish it here, is that there was no artificial barrier installed in the Bowdoin shots case. That was a case where the serving estate had cleaned out a ditch, and the dominant estate said, well, your farming practices on your property caused all this silt and sediment to build up, and it's blocking my water from draining down through there. Well, at the same time, the dominant estate in that case also had done some plowing of their field to cause an increase in sediment to come down into that ditch and accumulate down on the serving estate, thus blocking the flow coming from the dominant estate. But at the same time, the serving estate had not constructed a wall or any sort of artificial barrier as Floyd Box has done here. At the same time... Mr. Rich, before you conclude or your time runs out, I'm interested in the second issue, which is your claim that the court didn't give you money for replacing the culvert in April of 2020. What proof did you put on that would have allowed damages in that regard? At the case, and it was Exhibit V in the trial, and I don't recall as I sit here today what the actual exhibit number is on the appeal, but we submitted an invoice from Furlong Excavating. Furlong Excavating is the company of Brad Furlong and his wife Beth Furlong. We put Beth Furlong on at trial. She testified that the bill was reasonable. She testified that the bill was customary and it was standard charges for Furlong Excavating at the time. This item came in. There was no objection to the foundation. We established the foundation to that bill. I believe it's under Illinois law. The fact that it's unpaid does not mean it's admissible as the trial court found without authority. What it means is if you can establish the foundation, you can recover unpaid bills regardless if it has not been paid yet. The fact that they hadn't paid their own company does not mean that they can't recover it. Frankly, the statute requires it. Okay. Thank you. That concluded your time for right now. You'll have a few minutes after Mr. Hundley's argument. Mr. Hundley, you're on mute, but if you're ready to proceed, you may do so. Yes, Judge. Before you do that, let me interrupt one second if the court will stop the time. Justice Moore, I didn't ask you. Did you have any questions of Mr. Rich? No, I didn't. All right. How about you, Justice Vaughn? No questions. Thank you. All right. I apologize, Mr. Hundley. You may now proceed. Thank you. Thank you and may it please the court. My name is John Hundley and I represent the Court of Appeals in this matter. This was a case which was tried according to the plaintiff's option as a bench trial. That being the case, the standard of review here in the appellate court is the manifest weight of the evidence standard. The plaintiffs admit as much in their briefs. They pay lip service to this standard but then ignore what it really means. A judgment is against the manifest weight of the evidence only when findings appear to be unreasonable, arbitrary, or not based on evidence or when an opposite conclusion is apparent. That's Vaughn versus City of Carbondale, 2016, Illinois 119181 at paragraph 23. Under this standard, appellate courts both give great deference to the trial court findings because as the trier of fact, the trial court is in a superior position to observe the witnesses while testifying, to judge their credibility, and to determine the weight their testimony and other evidence should receive. That's International Capital Corporation versus Moyer, 347 L. App III at 121. As our Supreme Court has stated, it best be best, 223 Illinois second 350 to 51, a reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. It will not suffice to show that the record will support a contrary decision. Rather, if the record contains any evidence to support the trial court's judgment, the judgment should be affirmed. That's the Supreme Court and Department of Transportation XRL People versus 151 Interstate Road Corp, 209 Illinois second rather at 488. That being the law, let's look at the decision which the plaintiffs asked this court to overturn. First, the court assures us that page two of the appendix, C. 298 of the record, that it considered all the evidence. It goes on to say that it had evaluated the demeanor of the witnesses. This is an important assurance because, and basis for the court's decision because the credibility of the witnesses is at issue here, central. Based upon that evaluation, the court at page eight of the appendix says this court finds the defendant's evidence on the relevant issues to be more credible than that of the plaintiffs, close quote. The court ruled that the plaintiffs had not met their burden of proof. That's page eight of the appendix, C. 304. At page nine of the appendix, C. 305, the court finds that the box testimony on these issues to be credible. It goes on to find on the same page that there is credible testimony for the defense describing the drainage. In contrast, at page nine of the appendix, the court found that there was, quote, no credible and competent evidence as to actions by box allegedly taken to block the drainage. Now, these findings involve credibility determinations, and as the cases that I cited indicate, this is a, the trial court is in a uniquely good position to make those decisions, which are difficult for the appellate court to review. Now, the plaintiffs' faint umbrage that we have pointed out their lies in this regard, we have a dozen specifics on page 17 of the appellate's brief, and they, in response, reply, don't so much dispute that they made the misstatements as they claim that they were immaterial. But misstatements of fact under oath are material. They go to credibility, and the credibility of the witnesses is critical here. In addition to the half-dozen instances that I point out on page 17 of the brief, there's numerous others that were contained in the complaint. The allegations of the complaint were made under oath. That's at page C-16 of the record. There's no evidence in the record to support the claim that Mr. Box blocked the east side of the culvert before 2017, and allegation under oath made its page C-12 of the record. No evidence that he moved soil from plaintiff's property, an allegation made at C-12 again. No evidence that he made a berm in the road. No evidence that he moved dirt and rock from the road to form a barrier, an allegation also made at C-12. No evidence that he threw dirt and obstructions in the new culvert, an allegation made at C-13. No evidence... Mr. Hundley, Mr. Box admits he threw in the concrete cylinders at the end of the culvert. No, Judge, you have... Does... I think the record on page 39, 40, and 41 indicates that he admits to that. That was at least seven feet away from the culvert, Judge. Okay, seven feet away, but he does admit that he threw those cylinders. Eight to ten cylinders were thrown seven feet away from the end of the culvert. I'm also interested in the fact that he admits on the record at page 46 that if the wall and the cylinders were not in the way, the water would not be backed up. That's a factor that was ignored by the trial court in its order. Well, I don't believe that it was ignored, Judge, by the trial court. Maybe perhaps there's not an explicit reference to it in the order, but what there is is no evidence that the backing up of the water on the box side of the culvert backed up into the plaintiff's property. The plaintiff's property is a foot higher than the road, and the plaintiff's property... the road is six inches higher than the top of the culvert, so you would have to have had a foot and a half above the wall in order for the backup to have reached the plaintiff's property. But you can see in the exhibit where the water is backing up the property. Yes, but that does not... And your client, at page eight of the court's order, it seems to not include Box's testimony that the water was slowed. The court says that wasn't the testimony, and yet your client admitted in the record, I think at page 32, that he built the water and spread it out so it would go south. The court doesn't include that testimony. What do you have to say about your client's admission there? Well, the record just establishes that the wall is porous, that it spreads the water out in width, and that it does not establish what is required by the statute to be a material. Mr. Rich omitted the word material when he read the statute. It does not establish a material obstruction. There is no evidence in the record that the water ever backed up onto the plaintiff's property. Well, there certainly seems to be some dispute on page eight of the court's order as to what facts were in the record versus what the court placed. And I'm wondering what you think about that. I have to take the court, I take the court at its word that it considered all the evidence. 10-page order, 11-page order does not necessarily, cannot necessarily summarize every piece of evidence that was introduced over the course of a two-day trial. Oh, well, but I'm worried that the court here, and the record is referenced at C-305, where he finds the box testimony to be credible. He says that, rather, he described the flow as being diverted and spread out, but not blocked or slowed. Your client specifically admitted during trial that he placed this wall to slow the water, which would be an interference under the drainage code. Well, I disagree as to that legal conclusion. Slowing the water is not an interference if it allows the water to flow and does not back up. Well, I think the statute uses the word obstructing. And the definition of obstructing is to get in the way of. What would be the difference? Under the statute, the obstruction must, quote, materially impede or interfere with the flow of interference was shown. Okay, thank you. Thank you. Do you disagree that your client testified that the wall slowed the water? No, I do not disagree with that. Was he saying it slowed the water across his property or slowed it across the plaintiff's property? Slowed it across his property. How do we know that? Is that clear in the testimony? I believe it's clear in the and the testimony is that the wall is 30 feet away from the from the culvert. But you do have the photographs showing the backup of the water, correct? Yes, the photographs show a backup of the water on the box property. They do not show a backup of the water on the furlong property. And respectfully, I believe that that's what's required. Well, is that required or is there, does the drainage code say that any obstruction that materially affects the flow of water? I mean, do they have a burden to show that it obstructs the natural flow of the water or do they have to show that it backs it up on their property? Yes, Judge, because provided this section does not apply to ditches or drains which are entirely on the land of the landowner, nor does this section prohibit the construction of artificial impoundments or the temporary interruption of the flow of water by such impoundments. I believe that that necessarily means that they have to show backing up onto their property. If I may continue? Yes, of course. Thank you. I was noting several other occurrences where the plaintiffs misstated the facts. The plaintiffs alleged that on several there was never any evidence introduced to support that, no evidence of malice, an allegation that was made as page C-52. In short, there was a wholesale failure of the plaintiffs to prove their case except with respect to the wall that we've been discussing. And accordingly, the trial court found that Box did not take any other actions that are alleged in the complaint. Now, these findings are significant in light of the conflict of the evidence on several points and the credibility determinations which the trial court made. Now, the plaintiff sees upon the statement that was made at A-009, appendix page 9, that the wall was built in 2020 when it was actually built in 2019. This error is immaterial. The court on that same page states, it is clear that the evidence that there have been issues with the drainage along Stuber Road for more than 20 years, and at the same page it states, quote, furlong indicated that the culvert was filling with silt in 2017. Same page he observes, furlong also testified to damage to his crops in the part of the field at issue as far back as 2017, and the court was corrected these observations of the testimony. So, whether the wall was built in 2019 or 2020 is immaterial, does not matter. The same problems existed before 2019. The court's conclusion that the plaintiffs did not prove a causal connection between the wall and their alleged injuries is correct. I see my time is expiring. I would respectfully stand on my brief as to the other points at issue in this case. Thank you. Thank you, Mr. Hundley. Justice Moore, any questions? No questions. Justice Vaughn? No other questions, thank you. Okay, Mr. Rich, you're on mute, but when you come off, you have a few minutes. Thank you, Justice. Just to respond briefly to a couple of the points stated, Mr. Hundley indicated that there was no evidence that water backed up into furlong. Well, there is. We have the photographs that show the water backed up into the culvert, and that's the drain that cannot be backed up under the statue. And Mr. Hundley referenced that the furlong ground is of a higher elevation than even the roadway. Well, all that's true, but the ditches aren't. And so, what we're talking about, you can't back up the a component of that to a violation of the drainage code. And that's found in the Bosler case. And so, what you have to have is this passing back of water. And what we've shown, and what we believe the exhibits show, is that there is this passing back. The wall blocks the water, and it doesn't allow it to flow, so it backs up behind it and passes it back to where the water is coming from, not allowing it to flow naturally like it otherwise would. In the Bosler case, the servient estate had built a dam that created a pond. Well, the dominant estate claimed that this pond was causing water drainage issues on their property. However, the court found that the dam that was built to create that pond and the water that backed up was at all times below an elevation of the dominant estate. That's not what we have here, and the trial court's reliance on Bosler, I think, is misplaced because it's distinguishable. Here, we have the dam that was built, or the wall, that was of the same height as the top of the culvert, which it's a 24-inch culvert, so it's at least blocking 24 inches of drainage coming out of the dam. The next slide indicates that the wall was porous. Well, and I believe that was the intention of Mr. Box, but as we've seen throughout as this has gone along, that porous wall that has the holes in it has become blocked. As of January of 22, you could only see the top three of the six rows of the wall because of all the dirt, debris, and sediment that had built up against the wall, and if you look at the back side of the wall, there's no such buildup. You can see all six interfered with the flow of water from the Furlong property. The drain that we're talking about, we have photographs of it two-thirds of the way full. This idea that the water hasn't backed up onto the Furlong property, we have Mr. Box's testimony from that July 1st storm, that there was so much water, it was coming over the road and coming over the wall. And with that, I'll rest, but if you guys have any questions, I'd be happy to answer them if I can. I'm interested in your request for injunctive relief. You asked that the wall be taken down. Is there a less intrusive or obtrusive manner in which an injunction could issue? Well, I think there can be a remedy fashion to that point. The whole key is he can have a wall, but if he can't back it up onto the Furlong property, and so if he wants to divert it, put it farther down onto his property, if he wants to divert it more so the water doesn't back up into the culvert and cause drainage issues, getting water from the Furlong property, he's free to do so. I believe the record even indicated that the former road commissioner suggested putting in a dry dam and taking that water underground down to the creek. So there are options, and he has a right to do whatever he wants on his property so long as it doesn't affect the flow of the water from the Furlongs. Okay, thank you. Justice Moore, any questions? No. Justice Vaughn? With the standard being manifest weight of the evidence and the court's order finding that there was a history of drainage problems on this property, how do we not defer to the trial court's finding that there's been a history and this new wall didn't really change anything, that it did not back up on Furlong's property? There was always a drainage problem on Furlong's property. How do we get around that? Thank you, Judge. We get around that because Furlong improved the drainage on his property. If you took a look at the county engineer that came out there and looked at the culvert and the ditching that had been done, you look at Mr. Morton that had been out there looking at the ditches, they both said that adding this larger culvert and adding these ditches should improve drainage. Both of them indicated that this drainage was now better. We've never had the opportunity to even look to improve our drainage. That goes back to this liberal construction of the statute under the drainage code. We should be allowed for agricultural purposes to improve the drainage, to improve our crop production, to improve those types of things. I think that's how you get around that. The fact that there was prior water issues is irrelevant. We're trying to fix those issues. Under the court's analysis, so long as somebody defeats or neutralizes your efforts to assist in your drainage before you can see the fruits of what your work does, then there's no violation of the statute. That can't be the law. Thank you. All right. Thank you, Mr. Rich, for your comments. Mr. Hundley, this matter is of great interest. We'll take it under advisement and issue an order in due course.